43

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

No. 17-cr-20406

HON. JOHN CORBETT O'MEARA

v.

D-2 ALPHONS IACOBELLI,
D-3 MONICA MORGAN,

        Defendants.

Violations: **Conspiracy to Violate the Labor Management Relations Act** (18 U.S.C. § 371)

**Paying and Delivering Prohibited Money and Things of Value to Union Officials** (29 U.S.C. § 186(a)(2), (d)(1))

**Conspiracy to Defraud the United States** (18 U.S.C. § 371)

**Subscribing False Tax Returns** (26 U.S.C. § 7206(1))

**Willful Failure to File Tax Return** (26 U.S.C. § 7203)

U.S. DIST. COURT CLERK
EAST. DIST. MICHIGAN
DETROIT

2017 JUL 26 P 12:59

FILED

---

# <u>FIRST SUPERSEDING INDICTMENT</u>

THE GRAND JURY CHARGES:

1

## GENERAL ALLEGATIONS

At times relevant to this First Superseding Indictment:

1.     The Labor Management Relations Act, commonly known as the Taft Hartley Act, prohibited employers and persons acting in the interest of employers from paying, lending, or delivering, or agreeing to pay, lend, or deliver, any money or other thing of value to any officer or employee of a labor organization representing its employees.

2.     The Labor Management Relations Act also prohibited any officer or employee of a labor organization representing the employees of an employer from receiving, accepting, or agreeing to receive or accept, any money or other thing of value from that employer or from any person acting in the interest of that employer.

3.     One of the purposes of the Labor Management Relations Act was to combat the corruption of the collective bargaining process that occurs when a union employer gives something of value to a union representative.

### Relevant Organizations

4.     Fiat Chrysler Automobiles US LLC was an automotive company based in Auburn Hills, Michigan, and the successor to the automotive company formerly known as Chrysler Group LLC. Both are referred to here as "FCA." FCA

2

manufactured and sold automobiles in the United States under brands such as
Chrysler, Jeep, Dodge, and Ram. FCA was an employer in an industry affecting
interstate commerce and subject to the Labor Management Relations Act, 29
U.S.C. §§ 142 & 152.

5.      The International Union, United Automobile, Aerospace, and
Agricultural Implement Workers of America (UAW) was a labor organization
based in Detroit, Michigan. The UAW represented tens of thousands of non-
managerial employees employed by FCA at numerous locations in Michigan and
across the United States. The UAW was a labor organization subject to the Labor
Management Relations Act, 29 U.S.C. §§ 142 & 152.

6.      The UAW-Chrysler Skill Development & Training Program d/b/a the
UAW-Chrysler National Training Center (NTC) was a tax-exempt corporation
based in Detroit, Michigan. The NTC purported to function as a labor management
committee under the Labor Management Relations Act, 29 U.S.C. § 186(c)(9). The
stated purpose of the NTC was to provide for the education, training, and retraining
of workers.

7.      The governing body of the NTC was known as the Joint Activities
Board. The Vice President of Employee Relations of FCA and the Vice President
of the Chrysler Department of the UAW served as the Chairmen of the NTC Joint

3

Activities Board. The remainder of the Joint Activities Board was made up of senior officials from FCA and the UAW.

### Collective Bargaining Agreements between FCA and the UAW

8.     Approximately every four years FCA and the UAW engaged in national negotiations resulting in a collective bargaining agreement that set wages, attendance policies, profit sharing, ratification bonuses, holidays, and other working conditions for FCA employees represented by the UAW.

9.     In 2011 and 2015, UAW and FCA held national negotiation sessions that resulted in ratified collective bargaining agreements covering tens of thousands of FCA employees represented by the UAW.

### The Defendants

10.     ALPHONS IACOBELLI was the FCA Vice President for Employee Relations and a person acting in the interest of employer FCA from 2008 through 2015. As the FCA Vice President for Employee Relations, ALPHONS IACOBELLI was the senior FCA official responsible for negotiating with the UAW and for administering the collective bargaining agreements between FCA and the UAW. As the FCA Vice President for Employee Relations, ALPHONS IACOBELLI was FCA's lead representative for labor relations and managed FCA's relationship with the UAW. ALPHONS IACOBELLI was the senior FCA

4

official responsible for resolving disputes and grievances that arose under the collective bargaining agreements between FCA and the UAW.

11.    MONICA MORGAN was the girlfriend and, later, the spouse of UAW Vice President General Holiefield. From 2008 through 2014, General Holiefield was the senior UAW officer responsible for negotiating with FCA and for administering the collective bargaining agreements between the UAW and FCA on behalf of tens of thousands of FCA employees represented by the UAW. As UAW Vice President, General Holiefield was responsible for managing the UAW's relationship with FCA. Holiefield was the senior UAW official responsible for resolving disputes and grievances that arose under the collective bargaining agreements between the UAW and FCA.

12.    MONICA MORGAN owned and operated the company Wilson's Diversified Products LLC, also known as Wilson's Diversifed [sic] Products, and the company Monica Morgan Photography LLC, both located in Detroit, Michigan. MONICA MORGAN and General Holiefield also controlled the company identified here as *Morgan Company A* located in Detroit, Michigan.

13.    All dates in this First Superseding Indictment are alleged to have occurred on or about the stated dates.

## COUNT ONE

### (18 U.S.C. § 371 – Conspiracy to Violate the
### Labor Management Relations Act)

**D-2 ALPHONS IACOBELLI**
**D-3 MONICA MORGAN**

1.      Paragraphs 1 through 13 of the General Allegations are incorporated by reference here.

2.      Between on or about January 2009 and continuing through in or after July 2015, within the Eastern District of Michigan and elsewhere, ALPHONS IACOBELLI, MONICA MORGAN, Jerome Durden, and other individuals and entities known and unknown to the grand jury, did knowingly and voluntarily conspire to violate the Labor Management Relations Act. The objects of this conspiracy were:

(a) that one or more persons acting in the interest of employer FCA would willfully pay and deliver—and agree to pay and deliver—money and things of value to officers and employees of the UAW, the labor organization representing its employees, using the NTC with the intent to benefit persons who they knew were not permitted to receive the money and things of value, in violation of Title 29, United States Code, Section 186(a)(2), (d)(1); and

6

(b) that officers and employees of the UAW would willfully request, receive, and accept—and agree to receive and accept—money and things of value from employer FCA and one or more persons acting in the interest of FCA, using the NTC with the intent to benefit themselves and other persons who they knew were not permitted to receive the money and things of value, in violation of Title 29, United State Code, Section 186(b)(1), (d)(1).

3.      Over the course of the conspiracy, FCA Vice President ALPHONS IACOBELLI, FCA Financial Analyst Jerome Durden, and other co-conspirators acting in the interest of employer FCA, unlawfully paid and delivered more than $1.2 million in prohibited payments and things of value, directly and indirectly, to UAW Vice President General Holiefield and other UAW employees. The prohibited payments and things of value included personal travel, designer clothing, furniture, jewelry, and paying off the $262,219 mortgage on the residence of General Holiefield and MONICA MORGAN.

## UAW-Chrysler National Training Center

4.      FCA Vice President ALPHONS IACOBELLI, FCA Financial Analyst Jerome Durden, and their co-conspirators used NTC bank accounts and NTC credit card accounts to conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield and other senior UAW

7

officials.

5.     FCA Vice President ALPHONS IACOBELLI was the Co-Chairman of the NTC and the NTC Joint Activities Board from 2008 through 2015. FCA-7 was a member of the FCA Employee Relations Department who served on the NTC Joint Activities Board from 2007 until 2015. FCA-11 was a member of the FCA Employee Relations Department who served on the NTC Joint Activities Board from 2010 to 2015. FCA Financial Analyst Jerome Durden was a member of the FCA Corporate Accounting Department who served as the controller of the NTC from in and before 2008 through 2015.

6.     FCA provided the funding for the NTC. From 2009 to 2014, FCA made annual transfers to the NTC of between $13 million and $31 million per year. During that time period, FCA Vice President ALPHONS IACOBELLI, FCA-7, FCA-11, and FCA Financial Analyst Jerome Durden controlled the finances and spending of the NTC.

7.     The stated purpose of the NTC was to provide for the education, training, and retraining of FCA workers. However, FCA Vice President ALPHONS IACOBELLI, FCA-7, FCA-11, FCA Financial Analyst Jerome Durden, and others acting in the interest of employer FCA, directed hundreds of thousands of dollars in NTC funds to pay for personal travel, personal purchases

8

and personal expenditures of UAW Vice President General Holiefield and other UAW officials, their family members and their associates. ALPHONS IACOBELLI, FCA-7, FCA-11, Jerome Durden, and others acting in the interest of employer FCA also directed hundreds of thousands of dollars in NTC funds to companies and a purported charity that were controlled by UAW Vice President Holiefield and his girlfriend and later wife, MONICA MORGAN.

### The Leave the Light On Foundation

8.      The Leave the Light On Foundation (LTLOF) was a non-profit and tax-exempt organization based in Detroit, Michigan, that was controlled by UAW Vice President General Holiefield. FCA Vice President ALPHONS IACOBELLI, FCA Financial Analyst Jerome Durden, MONICA MORGAN, and their co-conspirators used the LTLOF to conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield.

9.      Between July 2009 and May 2011, FCA Vice President ALPHONS IACOBELLI, FCA Financial Analyst Jerome Durden, and others acting in the interest of employer FCA transferred more than $150,000 in funds to the LTLOF through the NTC, with funds provided by FCA.

10.      Between 2009 and 2014, FCA-10, a member of the FCA Employee Relations Department, served on the board of the LTLOF. FCA-11 also served on

9

the board of the LTLOF from 2009 to 2014. FCA Financial Analyst Jerome Durden was the Treasurer of the LTLOF from 2009 to 2014.

11.     In September 2009, FCA Financial Analyst Jerome Durden sent an email to FCA-7 and FCA-11 entitled "Summary of NTC Finance meeting 9/29/09 with AAI." In the email, Jerome Durden summarized their meeting with FCA Vice President ALPHONS IACOBELLI. Durden reported that IACOBELLI had said "it is time to consider restoring funding for selected 'high value/high leverage' programs." The email identified a $50,000 transfer to LTLOF as an example of a "selected" high leverage program. The email also noted, "The overall tone of the meeting was a desire to deliver some good news to the UAW for a change."

12.     In March 2011, UAW Vice President General Holiefield sent written correspondence asking for donations to the LTLOF in which he stated that he had formed the foundation "to help children who are struggling with hardships." However, at the direction of General Holiefield, the majority of operating funds spent by the LTLOF between 2009 and 2011 were paid to his girlfriend MONICA MORGAN.

13.     Between 2009 and 2011, the LTLOF paid more than $70,000 to MONICA MORGAN through her business Monica Morgan Photography. The payments to MONICA MORGAN were made with the knowledge and approval of

FCA Vice President ALPHONS IACOBELLI, FCA-7, FCA-10, FCA-11, FCA Financial Analyst Jerome Durden, and others acting in the interest of employer FCA. MONICA MORGAN used those funds to pay for personal purchases and expenditures at retailers, night clubs, and restaurants.

### Paying for Personal Travel of General Holiefield and Monica Morgan

14.     In May 2011, FCA Financial Analyst Jerome Durden sent an email to FCA Vice President ALPHONS IACOBELLI, FCA-7, and FCA-11 informing them that UAW officials had made arrangements for General Holiefield's girlfriend MONICA MORGAN to fly first-class from Detroit, Michigan to San Diego, California.

15.     On the same day, ALPHONS IACOBELLI emailed a response to Jerome Durden stating "wouldn't put this in writing. No worries, we can cover."

16.     On the same day, FCA-11 emailed a response to Jerome Durden stating "Okay. Next time just tell us about it verbally."

17.     Also in May 2011, an airline ticket was purchased on an NTC credit card for MONICA MORGAN to travel from Detroit, Michigan to San Diego, California at a cost of more than $2,200. The expenditure was authorized by ALPHONS IACOBELLI, acting in the interest of employer FCA, and was paid for with funds provided by FCA.

11

18.     Between May 2011 and October 2013, the NTC purchased more than $30,000 in airline tickets for General Holiefield's girlfriend and later wife MONICA MORGAN to travel to locations such as Miami, Florida, Las Vegas, Nevada, and Los Angeles, California. The purchases were authorized by FCA Vice President ALPHONS IACOBELLI, FCA-7, FCA-11, FCA Financial Analyst Jerome Durden, and others acting in the interest of employer FCA, and were paid for with funds provided by FCA.

19.     In June 2011, FCA Vice President ALPHONS IACOBELLI authorized an expenditure for UAW Vice President General Holiefield to stay at a suite in the Beverly Hills Hotel in Beverly Hills, California for four nights at a cost of $3,100 per night.

### Wilson's Diversified Products

20.     In December 2010, MONICA MORGAN established a corporation called Wilson's Diversifed [sic] Products, LLC based in Detroit, Michigan. Also in December of 2010, MONICA MORGAN opened a corporate bank account at Bank of America in Detroit, Michigan in the name Wilson's Diversified Products. FCA Vice President ALPHONS IACOBELLI, FCA Financial Analyst Jerome Durden, MONICA MORGAN, and their co-conspirators used Wilson's Diversified Products to conceal prohibited payments and things of value paid and delivered to

UAW Vice President General Holiefield.

21.    In January 2011, the NTC selected Wilson's Diversified Products as a vendor to provide shirts, key chains, coffee mugs, and other novelty items commonly referred to as trinkets and trash. Wilson's Diversified Products was selected as a vendor without submitting a competitive bid or a quote to the NTC.

22.    Between January 2011 and July 2012, the NTC transferred more than $425,000 to Wilson's Diversified Products. The transfers to Wilson's Diversified Products occurred with the knowledge and approval of FCA Vice President ALPHONS IACOBELLI, FCA-7, FCA-11, FCA Financial Analyst Jerome Durden, and others acting in the interest of employer FCA, and were paid for with funds provided by FCA. FCA Financial Analyst Jerome Durden reported that he, IACOBELLI, FCA-7, FCA-11, and other FCA officials viewed those payments as an investment in "relationship building" with UAW Vice President General Holiefield.

23.    In 2011 and 2012, MONICA MORGAN made approximately $65,000 in cash withdrawals from the bank account of Wilson's Diversified Products and spent tens of thousands of additional dollars from that account to pay for personal purchases and expenditures. In March 2012, MONICA MORGAN and General Holiefield used more than $15,000 in funds from the Wilson's Diversified

13

Products account to pay closing costs for the purchase of their residence in Harrison Township, Michigan.

### *Morgan Company A*

24.     In 2011, the UAW President confronted UAW Vice President General Holiefield and FCA Vice President ALPHONS IACOBELLI over the selection of MONICA MORGAN to be a vendor to the NTC and the LTLOF. During a face-to-face meeting in Auburn Hills, Michigan, the UAW President warned Holiefield and IACOBELLI that paying MONICA MORGAN was a bad idea and that they could "go to jail" and instructed them not to direct any additional business to MONICA MORGAN.

25.     In early 2012, MONICA MORGAN and General Holiefield approached an associate identified here as MCA-1. MONICA MORGAN and General Holiefield asked MCA-1 to set up a new company to supply shirts, cups, and other trinkets and trash to the NTC. MONICA MORGAN and General Holiefield explained that they needed MCA-1 to be their nominee in order to get around conflicts of interest rules.

26.     In January 2012, MCA-1 established a Michigan corporation identified here as *Morgan Company A* based in Detroit, Michigan. *Morgan Company A* was selected as an NTC vendor to supply novelty items and trinkets

14

and trash without submitting a competitive bid or a quote to the NTC. FCA Vice President ALPHONS IACOBELLI, FCA Financial Analyst Jerome Durden, MONICA MORGAN, and their co-conspirators used *Morgan Company A* to conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield.

27.     Between February 2012 and November 2012, the NTC transferred more than $200,000 to *Morgan Company A*. The transfers to *Morgan Company A* occurred with the knowledge and approval of FCA Vice President ALPHONS IACOBELLI, FCA-7, FCA-11, and FCA Financial Analyst Jerome Durden, and others acting in the interest of employer FCA, and were paid for with funds provided by FCA.

28.     Between February 2012 and January 2013, approximately $85,000 in funds were transferred from *Morgan Company A* to entities controlled by MONICA MORGAN and General Holiefield.

### Credit Cards for UAW Officials

29.     In and after 2012, FCA Vice President ALPHONS IACOBELLI directed FCA Financial Analyst Jerome Durden to obtain credit cards for UAW Vice President General Holiefield and for other senior UAW officials. The credit cards were issued through accounts maintained in the name of the NTC and were

paid for with funds provided by FCA. FCA Vice President ALPHONS IACOBELLI, FCA Financial Analyst Jerome Durden, MONICA MORGAN, and their co-conspirators used the NTC credit cards to conceal prohibited payments and things of value paid and delivered to UAW Vice President General Holiefield and other senior UAW officials.

30.    In and after 2012, ALPHONS IACOBELLI and others acting in the interest of employer FCA encouraged and authorized UAW Vice President General Holiefield and other senior UAW officials to use the NTC credit cards to pay for personal purchases and personal expenditures. FCA Financial Analyst Jerome Durden reported that he, IACOBELLI, FCA-7, and FCA-11 created a liberal spending policy for the NTC issued credit cards as part of their effort to keep the senior members of the UAW Chrysler Department "fat, dumb and happy."

31.    In and after 2012, FCA Financial Analyst Jerome Durden personally collected the credit card statements for UAW Vice President General Holiefield and other UAW officials that were mailed to the NTC offices. Durden also instructed the members of the NTC accounting staff not to open, examine, or review the NTC credit card statements.

32.    In 2012 and 2013, UAW Vice President General Holiefield made over

$200,000 worth of personal purchases on his credit card, including jewelry, furniture, designer clothing, and other personal items and expenses. These expenditures were authorized by FCA Vice President ALPHONS IACOBELLI, FCA-7, FCA-11, FCA Financial Analyst Jerome Durden, and others acting in the interest of employer FCA, and were paid for with funds provided by FCA.

### Paying Off the UAW Vice President's Mortgage

33.     In June 2014, FCA Vice President ALPHONS IACOBELLI instructed FCA Financial Analyst Jerome Durden to issue an NTC check in the amount of $262,219.71 payable to the entity MMS Mortgage Services, LTD. Later in June 2014, that check was presented to pay off the full balance of the mortgage on the residence of UAW Vice President General Holiefield and MONICA MORGAN in Harrison Township, Michigan. The payment of $262,219.71 occurred with the knowledge and approval of ALPHONS IACOBELLI, FCA-11, FCA Financial Analyst Jerome Durden and others acting in the interest of employer FCA, and was paid for with funds provided by FCA.

### Concealment of the Criminal Conspiracy

34.     In or before February of 2012, FCA-7 instructed FCA Financial Analyst Jerome Durden to take steps to conceal NTC expenditures made for the benefit of UAW officials that might "raise eyebrows."

17

35.     In February 2012, FCA Financial Analyst Jerome Durden directed that payments to Master Card, Diners Club, Wilson's Diversified Products, Monica Morgan Photography, and the Leave the Light On Foundation, among others, were to be "screened" from the members of the NTC accounting staff. Durden also took steps to change the security settings of the NTC accounting software to further conceal those payments.

36.     In October 2013, the UAW President, the UAW General Counsel, and other UAW senior officials began looking into financial transactions involving the NTC, the LTLOF and MONICA MORGAN.

37.     FCA-10 was a member of the FCA Employee Relations Department. FCA Vice President ALPHONS IACOBELLI directed FCA-10 to, as part of FCA-10's official duties, "resolve special issues . . . of a sensitive nature." In or about October 2013, after meeting with the UAW President and the UAW General Counsel, UAW Vice President General Holiefield contacted FCA-10.

38.     In or about October 2013, FCA-10 sent an email to FCA Vice President ALPHONS IACOBELLI stating that "[The UAW President and the UAW General Counsel] . . . want to go through NTC financials looking for something . . . .They are apparently questioning something about [Leave the Light On Foundation] payments . . . Not sure why they should have access to a charity's

18

books . . . . General needs to talk to you directly."

39.     In and after January 2014, the UAW President made official requests to FCA for information on the use of NTC credit cards by UAW Vice President Holiefield and other UAW officials. FCA Vice President ALPHONS IACOBELLI, FCA-7 and FCA Financial Analyst Jerome Durden refused to provide that information.

40.     In or about January 2014, a senior assistant to the UAW President made a request to FCA-7 for records and information on the use of NTC credit cards by UAW Vice President General Holiefield and other UAW officials. In or about February 2014, FCA-7 sent an email to FCA Vice President ALPHONS IACOBELLI stating "We can't provide the requested type of information to such people" and "If we tell [the UAW President and the UAW President's senior assistant] that we aren't giving them shit, what are they going to do, tell [FCA-1] we are being uncooperative? If so, so what?" ALPHONS IACOBELLI responded, "We are providing nothing. Just what we reviewed for the binder…in about a month…maybe." And: "We're gonna have fun with these evil people."

## Overt Acts

41.     One or more members of the conspiracy completed one or more of the following acts to effect the object of the conspiracy:

19

42.    In December 2010, MONICA MORGAN established a corporation called Wilson's Diversifed [sic] Products based in Detroit, Michigan.

43.    In December 2010, MONICA MORGAN, using the name "M. Alise Morgan," opened an account in the name Wilson's Diversified Products at Bank of America in Detroit, Michigan.

44.    In May of 2011, FCA Vice President ALPHONS IACOBELLI authorized the expenditure of more than $2,200 to pay for airline travel for MONICA MORGAN, the girlfriend of UAW Vice President General Holiefield.

45.    In May of 2011, FCA Vice President ALPHONS IACOBELLI sent an email to FCA Financial Analyst Jerome Durden cautioning Durden not to put the details of certain expenditures made for the benefit of UAW Vice President General Holiefield in writing.

46.    In 2012 and 2013, FCA Vice President ALPHONS IACOBELLI authorized the expenditure of more than $200,000 to pay for personal purchases made by UAW Vice President General Holiefield, including jewelry, furniture, designer clothing, and other personal items and expenses.

47.    In June 2014, FCA Vice President ALPHONS IACOBELLI authorized the expenditure of $262,219.71 to pay off the mortgage on the residence of UAW Vice President General Holiefield and MONICA MORGAN in Harrison

Township, Michigan.

48.     In February and March of 2015, MONICA MORGAN obtained more

than $130,000 from Westar Mortgage, Inc. as an equity loan on her residence in

Harrison Township, Michigan.

All in violation of Title 18, United States Code, Section 371.


## COUNT TWO

### 29 U.S.C. § 186(a)(2), (d)(1) – Paying and Delivering Prohibited Money and Things of Value to a Union Official

### D-2 ALPHONS IACOBELLI

1.     Paragraphs 1 through 13 of the General Allegations are incorporated

by reference here.

2.     In or about December 2012, in the Eastern District of Michigan and

elsewhere, ALPHONS IACOBELLI, acting in the interest of employer FCA,

willfully paid and delivered, and caused to be paid and delivered, money and

things of value to UAW Vice President General Holiefield, an officer of a labor

organization representing the employees of FCA, using the NTC with the intent to

benefit a person he knew was not permitted to receive money and things of value,

that is, expenditures of over $1,000 for the purchase of designer clothing by UAW

Vice President General Holiefield, which expenditures were paid for with funds provided by FCA.

All in violation of Title 29, United States Code, Section 186(a)(2), (d)(1).

## COUNT THREE

### 29 U.S.C. § 186(a)(2), (d)(1) – Paying and Delivering Prohibited Money and Things of Value to a Union Official

**D-2 ALPHONS IACOBELLI**

1.      Paragraphs 1 through 13 of the General Allegations are incorporated by reference here.

2.      In and before June 2014, in the Eastern District of Michigan and elsewhere, ALPHONS IACOBELLI, acting in the interest of employer FCA, willfully agreed to pay, paid and delivered, and caused to be paid and delivered, money and things of value to General Holiefield, an officer and employee of a labor organization representing the employees of FCA, using the NTC with the intent to benefit a person he knew was not permitted to receive money and things of value, that is, the expenditure of $262,219.71 to pay off the mortgage on the residence of General Holiefield, which expenditure was paid for with funds provided by FCA.

All in violation of Title 29, United States Code, Section 186(a)(2), (d)(1).

22

## COUNT FOUR

### 18 U.S.C. § 371 – Conspiracy to Defraud the United States

### D-2 ALPHONS IACOBELLI

1.      Paragraphs 1 through 13 of the General Allegations are incorporated by reference here.

2.      Between 2009 and 2016, in the Eastern District of Michigan and elsewhere, ALPHONS IACOBELLI, Jerome Durden and other individuals and entities, both known and unknown to the Grand Jury, did knowingly, intentionally, and willfully conspire to defraud the United States by impeding, impairing, obstructing, and defeating the Internal Revenue Service from ascertaining, computing, assessing, and collecting taxes.

### UAW-Chrysler National Training Center

3.      The NTC was a non-profit corporation organized and registered under the laws of the State of Michigan. In or about 1986, the NTC was granted tax-exempt status by the Internal Revenue Service to operate as an organization established to provide for the education, training and retraining of workers.

4.      The NTC elected to operate on a fiscal year beginning October 1st and ending September 30th. The NTC was required to file true and accurate IRS Form 990 tax returns for each year it was in operation.

5.     ALPHONS IACOBELLI was the Co-Chairman of the NTC Joint Activities Board from 2008 through 2015. General Holiefield was the Co-Chairman of the NTC Joint Activities Board from in or before 2008 through 2014. Jerome Durden was the controller of the NTC from 2008 through 2015.

## The Leave the Light On Foundation

6.     The LTLOF was a non-profit corporation organized and registered under the laws of the State of Michigan as the successor in fact to a Michigan non-profit corporation called the Hand-In-Hand Foundation. In or about 2002, the Hand-in-Hand Foundation was granted tax-exempt status by the Internal Revenue Service to operate as a charitable organization. In February of 2008, the Hand-in-Hand Foundation officially changed its name to the Leave the Light On Foundation. The stated purpose of the LTLOF was to raise money to be used for charitable and community activities.

7.     The LTLOF was required to file true and accurate IRS Form 990 tax returns for each year it was in operation.

## The Conspiracy

8.     ALPHONS IACOBELLI, General Holiefield, Jerome Durden, and others received millions of dollars in compensation from the NTC, which

24

compensation was falsely and fraudulently omitted from IRS Form 990 returns filed by the NTC with the Internal Revenue Service.

9.      ALPHONS IACOBELLI, General Holiefield, Jerome Durden, and others concealed more than a million dollars in prohibited payments and things of value that were paid and delivered to UAW Vice President General Holiefield, his girlfriend and later wife MONICA MORGAN and to other UAW officials and their associates and family members, by individuals acting in the interest of employer FCA, using funds provided by FCA.

10.     ALPHONS IACOBELLI, General Holiefield, Jerome Durden, and others directed and caused the NTC to engage in hundreds of thousands of dollars in business transactions with interested parties, including current and former officers, directors, trustees, and key employees, with their family members and with entities they owned or controlled, which business transactions were falsely and fraudulently omitted from the IRS Form 990 returns filed by the NTC with the Internal Revenue Service.

11.     ALPHONS IACOBELLI, General Holiefield, Jerome Durden, and others transferred, and caused to be transferred, tens of thousands of dollars in funds from the LTLOF to General Holiefield through Monica Morgan and through one or more entities owned or controlled by General Holiefield and Monica

Morgan, which transfers were falsely and fraudulently omitted from the IRS Form 990 returns filed on behalf of the LTLOF with the Internal Revenue Service.

12. ALPHONS IACOBELLI, General Holiefield, Jerome Durden, and others caused and directed the LTLOF to engage in excess benefit transactions for the direct benefit of Monica Morgan and for the indirect benefit of General Holiefield, which excess benefit transactions were falsely and fraudulently omitted from the IRS Form 990 returns filed on behalf of the LTLOF with the Internal Revenue Service.

13. ALPHONS IACOBELLI and others failed to report compensation they received from the NTC on the IRS Form 1040 returns filed with the Internal Revenue Service.

## Overt Acts

14. One or more members of the conspiracy completed one or more of the following acts to effect the object of the conspiracy:

15. In or about July of 2009, ALPHONS IACOBELLI, Jerome Durden, General Holiefield, and others transferred $15,000 in funds from the NTC to the LTLOF.

16. On or about February 25, 2011, Jerome Durden signed and filed a FY 2009 IRS Form 990 for the NTC which return failed to identify the LTLOF as a

26

related entity and failed to accurately report the transfer of $15,000 in funds from the NTC to the LTLOF during that tax year.

17.     Between October 2009 and September 2010, ALPHONS IACOBELLI, Jerome Durden, General Holiefield, and others transferred $56,000 in funds from the NTC to the LTLOF.

18.     On or about February 25, 2011, Jerome Durden signed and filed a FY 2010 IRS Form 990 on behalf of the NTC which return failed to identify the LTLOF as a related entity and failed to accurately report the transfer of $56,000 in funds from the NTC to the LTLOF during that tax year.

19.     Between January 2010 and December 2010, General Holiefield, Jerome Durden, and others transferred $53,015 in funds from the LTLOF to a company controlled by Monica Morgan.

20.     On or about November 1, 2011, Jerome Durden signed and filed a 2010 IRS Form 990 EZ on behalf of the LTLOF which return failed to accurately report the transfer of $53,015 in funds from the LTLOF to General Holiefield through a company controlled by Monica Morgan during that tax year.

21.     Between October 2010 and September 2011, ALPHONS IACOBELLI, Jerome Durden, General Holiefield, and others transferred more than

$421,960 in funds from the NTC to two separate companies controlled by Monica Morgan.

22.    Between October 2010 and September 2011, ALPHONS IACOBELLI, Jerome Durden, General Holiefield, and others transferred more than $122,000 in funds from the NTC to the LTLOF.

23.    Between October 2010 and September 2011, ALPHONS IACOBELLI, Jerome Durden, and others transferred more than $20,690 in funds from the NTC to pay for personal American Express credit card expenses of ALPHONS IACOBELLI.

24.    On or about May 15, 2012, Jerome Durden signed and filed a FY 2011 IRS Form 990 on behalf of the NTC which return failed to identify the LTLOF as a related entity, failed to accurately report the transfer of $122,000 in funds from the NTC to the LTLOF during that tax year, failed to accurately report the $421,960 in funds transferred from the NTC to two separate companies controlled by Monica Morgan and failed to accurately report more than $20,690 in compensation paid to ALPHONS IACOBELLI.

25.    Between October 2011 and September 2012, ALPHONS IACOBELLI, Jerome Durden, General Holiefield, and others transferred more than

28

$246,652 in funds from the NTC to three separate companies controlled by Monica Morgan.

26.     Between October 2011 and September 2012, ALPHONS IACOBELLI, Jerome Durden, General Holiefield, and others transferred more than $89,200 in funds from the NTC to LTLOF.

27.     Between October 2011 and September 2012, ALPHONS IACOBELLI, Jerome Durden, and others transferred more than $17,095 in funds from the NTC to pay for personal American Express credit card expenses of ALPHONS IACOBELLI, transferred $35,000 in funds from the NTC to be used as a down payment for two solid gold limited edition Mont Blanc fountain pens costing $35,700 each for ALPHONS IACOBELLI and transferred more than $96,000 in funds from the NTC to pay for the installation of a swimming pool, outdoor kitchen and outdoor spa at the residence of ALPHONS IACOBELLI in Rochester Hills, Michigan.

28.     On or about May 14, 2013, Jerome Durden signed and filed a FY 2012 IRS Form 990 on behalf of the NTC which return failed to accurately report the $246,652 in funds transferred from the NTC to three separate companies controlled by Monica Morgan, failed to accurately report the transfer of $89,200 in

funds from the NTC to the LTLOF, and failed to accurately report more than

$148,095 in compensation paid to ALPHONS IACOBELLI.

29.     On or about March 27, 2013, ALPHONS IACOBELLI signed and

filed a 2012 IRS Form 1040 Individual Tax Return which return failed to report

approximately $415,794 in income he diverted from the NTC in calendar year

2012.

30.     Between October 2012 and September 2013, ALPHONS

IACOBELLI, Jerome Durden, General Holiefield, and others transferred more than

$40,854 in funds from the NTC to two separate companies controlled by Monica

Morgan.

31.     Between October 2012 and September 2013, ALPHONS

IACOBELLI, Jerome Durden, General Holiefield, and others transferred more than

$104,200 in funds from the NTC to LTLOF.

32.     Between October 2012 and September 2013, ALPHONS

IACOBELLI, Jerome Durden, and others transferred $40,684 in funds from the

NTC to complete the purchase of two limited edition solid gold Mont Blanc

fountain pens costing $35,700 each by ALPHONS IACOBELLI, transferred

$159,425 in funds from the NTC to pay for personal American Express and Chase

credit card expenses of ALPHONS IACOBELLI, and transferred more than

$375,047 in funds from the NTC to pay for the installation of a swimming pool, outdoor kitchen, and outdoor spa at the residence of ALPHONS IACOBELLI in Rochester Hills, Michigan, and landscaping at other locations.

33.     On or about May 13, 2014, Jerome Durden signed and filed a FY 2013 IRS Form 990 on behalf of the NTC which return failed to accurately report the $40,854 in funds transferred from the NTC to two separate companies controlled by Monica Morgan, failed to accurately report the transfer of $104,200 in funds from the NTC to the LTLOF, and failed to accurately report more than $575,156 in compensation paid to ALPHONS IACOBELLI.

34.     On or about March 19, 2014, ALPHONS IACOBELLI signed and filed a 2013 IRS Form 1040 Individual Tax Return which return failed to report approximately $425,230 in income he diverted from the NTC in calendar year 2013.

35.     Between October 2013 and September 2014, ALPHONS IACOBELLI, Jerome Durden, and others transferred more than $403,834 in funds from the NTC to pay for personal American Express and Chase credit card expenses of ALPHONS IACOBELLI, transferred more than $350,000 in funds from the NTC to pay for the purchase of a 2013 Ferrari 458 Spider automobile by ALPHONS IACOBELLI, transferred more than $44,491 in funds from the NTC to

pay off a student loan for a relative of ALPHONS IACOBELLI, and transferred more than $73,000 in funds from the NTC to pay for landscaping at the residence of ALPHONS IACOBELLI and at other locations selected by ALPHONS IACOBELLI.

36.    In June of 2014, ALPHONS IACOBELLI, Jerome Durden, General Holiefield, and others transferred more than $262,000 in funds from the NTC to pay off the mortgage on the residence of General Holiefield and Monica Morgan located in Harrison Township, Michigan.

37.    On or about May 11, 2015, Jerome Durden signed and filed a FY 2014 IRS Form 990 on behalf of the NTC which return failed to accurately report more than $262,000 in compensation paid to General Holiefield and failed to accurately report more than $871,330 in compensation paid to ALPHONS IACOBELLI.

38.    On or about March 19, 2015, ALPHONS IACOBELLI signed and filed a 2014 IRS Form 1040 Individual Tax Return which return failed to report approximately $861,927 in income he diverted from the NTC in calendar year 2014.

39.    Between January 2015 and June 2015, ALPHONS IACOBELLI, Jerome Durden, and others transferred more than $337,004 in funds from the NTC

32

to pay for personal American Express and Chase credit card expenses of ALPHONS IACOBELLI and transferred more than $67,500 in funds from the NTC to pay for personal travel by private jet by ALPHONS IACOBELLI and others.

40. On or about March 28, 2016, ALPHONS IACOBELLI signed and filed a 2015 IRS Form 1040 Individual Tax Return which return failed to report approximately $404,504 in income he diverted from the NTC in calendar year 2015.

All in violation of Title 18, United States Code, Section 371.

## COUNT FIVE

### 26 U.S.C. § 7206(1) – Subscribing a False Tax Return

**D-2 ALPHONS IACOBELLI**

1. Paragraphs 1 through 13 of the General Allegations are incorporated by reference here.

2. On or about March 27, 2013, in the Eastern District of Michigan, ALPHONS IACOBELLI, a resident of Rochester Hills, Michigan, did willfully make and subscribe a Form 1040 Individual Income Tax Return for calendar year 2012, verified by a written declaration that it was made under the penalties of

perjury and filed with the Internal Revenue Service, which income tax return ALPHONS IACOBELLI did not believe to be true and correct as to every material matter, in that the return failed to report additional income, in the amount of approximately $415,794, that ALPHONS IACOBELLI received in calendar year 2012.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT SIX

### 26 U.S.C. § 7206(1) – Subscribing a False Tax Return

### D-2 ALPHONS IACOBELLI

1.      Paragraphs 1 through 13 of the General Allegations are incorporated by reference here.

2.      On or about March 19, 2014, in the Eastern District of Michigan, ALPHONS IACOBELLI, a resident of Rochester Hills, Michigan, did willfully make and subscribe a Form 1040 Individual Income Tax Return for calendar year 2013, verified by a written declaration that it was made under the penalties of perjury and filed with the Internal Revenue Service, which income tax return ALPHONS IACOBELLI did not believe to be true and correct as to every material matter, in that the return failed to report additional income, in the amount of

34

approximately $425,230, that ALPHONS IACOBELLI received in calendar year 2013.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT SEVEN

### 26 U.S.C. § 7206(1) – Subscribing a False Tax Return

**D-2 ALPHONS IACOBELLI**

1.     Paragraphs 1 through 13 of the General Allegations are incorporated by reference here.

2.     On or about March 19, 2015, in the Eastern District of Michigan, ALPHONS IACOBELLI, a resident of Rochester Hills, Michigan, did willfully make and subscribe a Form 1040 Individual Income Tax Return for calendar year 2014, verified by a written declaration that it was made under the penalties of perjury and filed with the Internal Revenue Service, which income tax return ALPHONS IACOBELLI did not believe to be true and correct as to every material matter, in that the return failed to report additional income, in the amount of approximately $861,927, that ALPHONS IACOBELLI received in calendar year 2014.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT EIGHT

### 26 U.S.C. § 7206(1) – Subscribing a False Tax Return

**D-2 ALPHONS IACOBELLI**

1.      Paragraphs 1 through 13 of the General Allegations are incorporated by reference here.

2.      On or about March 28, 2016, in the Eastern District of Michigan, ALPHONS IACOBELLI, a resident of Rochester Hills, Michigan, did willfully make and subscribe a Form 1040 Individual Income Tax Return for calendar year 2015, verified by a written declaration that it was made under the penalties of perjury and filed with the Internal Revenue Service, which income tax return ALPHONS IACOBELLI did not believe to be true and correct as to every material matter, in that the return failed to report additional income, in the amount of approximately $404,504, that ALPHONS IACOBELLI received in calendar year 2015.

All in violation of Title 26, United States Code, Section 7206(1).

36

## COUNT NINE

### 26 U.S.C. § 7206(1) – Subscribing a False Tax Return

**D-*1* MONICA MORGAN**

1.      Paragraphs 1 through 13 of the General Allegations are incorporated by reference here.

2.      On or about November 3, 2014, said date being approximate, in the Eastern District of Michigan, MONICA MORGAN, a resident of Harrison Township, Michigan, did willfully make and subscribe a Form 1040 Individual Income Tax Return for calendar year 2011, verified by a written declaration that it was made under the penalties of perjury and filed with the Internal Revenue Service, which income tax return MONICA MORGAN did not believe to be true and correct as to every material matter, in that the return failed to report additional income, in the amount of approximately $201,231, that MONICA MORGAN received in calendar year 2011.

All in violation of Title 26, United States Code, Section 7206(1).

37

## COUNT TEN

### 26 U.S.C. § 7206(1) – Subscribing a False Tax Return

**D-1 MONICA MORGAN**

1.    Paragraphs 1 through 13 of the General Allegations are incorporated by reference here.

2.    On or about November 3, 2014, in the Eastern District of Michigan, MONICA MORGAN, a resident of Harrison Township, Michigan, did willfully make and subscribe a Form 1040 Individual Income Tax Return for calendar year 2012, verified by a written declaration that it was made under the penalties of perjury and filed with the Internal Revenue Service, which income tax return MONICA MORGAN did not believe to be true and correct as to every material matter, in that the return failed to report additional income, in the amount of approximately $106,303, that MONICA MORGAN received in calendar year 2012.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT ELEVEN

### 26 U.S.C. § 7206(1) – Subscribing a False Tax Return

**D-1 MONICA MORGAN**

1. Paragraphs 1 through 13 of the General Allegations are incorporated by reference here.

2. On or about November 19, 2014, in the Eastern District of Michigan, MONICA MORGAN, a resident of Harrison Township, Michigan, did willfully make and subscribe a Form 1040 Individual Income Tax Return for calendar year 2013, verified by a written declaration that it was made under the penalties of perjury and filed with the Internal Revenue Service, which tax return MONICA MORGAN did not believe to be true and correct as to every material matter, in that the return failed to report additional income, in the amount of approximately $28,491, that MONICA MORGAN received in calendar year 2013.

All in violation of Title 26, United States Code, Section 7206(1).

## COUNT TWELVE

### 26 U.S.C. § 7203 – Willful Failure to File a Tax Return

**D-2 MONICA MORGAN**

1.    Paragraphs 1 through 13 of the General Allegations are incorporated by reference here.

2.    Between January 2014 and December 2014, MONICA MORGAN, a resident of Harrison Township, Michigan, received more than $262,220 in income. In and after April 2015, MONICA MORGAN willfully and intentionally failed to file a Form 1040 Individual Income Tax Return for calendar year 2014 as required by law.

All in violation of Title 26, United States Code, Section 7203.

## FORFEITURE ALLEGATION

### 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Criminal Forfeiture

1.    Paragraphs 1 through 13 of the General Allegations and Counts One through Three are incorporated by reference for the purpose of alleging forfeiture under Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

40

2.     Under Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), upon conviction of a violation of Title 29, United States Code, Section 186 or a conspiracy to violate Title 29, United States Code, Section 186, in violation of Title 18, United States Code, Section 371, the defendants, ALPHONS IACOBELLI and MONICA MORGAN, shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to these violations. The property to be forfeited includes, but is not limited to, the entry of a forfeiture money judgment for the total amount of proceeds personally obtained by each defendant as a result of the count(s) of conviction.

3.     If, as a result of any act or omission of the defendants, the criminal proceeds obtained by each defendant:

a.     cannot be located upon the exercise of due diligence;

b.     have been transferred or sold to, or deposited with, a third party;

c.     have been placed beyond the jurisdiction of the court;

d.     have been substantially diminished in value; or

41

e.      have been commingled with other property which cannot be divided
without difficulty,

the United States of America shall be entitled to forfeit substitute property under
Title 21, United States Code, Section 853(p), as incorporated by Title 28, United
States Code, Section 2461(c).

                                        THIS IS A TRUE BILL.

                                        /s/ GRAND JURY FOREPERSON
                                          GRAND JURY FOREPERSON

DANIEL L. LEMISCH
Acting United States Attorney


/s/ Bruce C. Judge                      /s/ Stephanie M. Gorgon
Bruce C. Judge                          Stephanie M. Gorgon
Assistant United States Attorney        Assistant United States Attorney


/s/ Charles J. Kalil II
Charles J. Kalil II
Assistant United States Attorney


Date:   7-26-17

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | **Case Number**<br>17-cr-20406 |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

| **Companion Case Information** | **Companion Case Number:** |
|---|---|
| This may be a companion case based upon **LCrR 57.10 (b)(4)¹:** | **Judge Assigned:** |
| ☐ Yes    ☒ No | **AUSA's Initials:** _BCJ_ |

Case Title: USA v. Alphons Iacobelli _____

County where offense occurred : Wayne County and Oakland County _____

Check One:    ☒ **Felony**         ☐ **Misdemeanor**         ☐ **Petty**

____Indictment/____Information --- **no prior complaint.**
____Indictment/____Information --- **based upon prior complaint** *[Case number:* _____ *]*
_✓_ Indictment/____Information --- **based upon LCrR 57.10 (d)** *[Complete Superseding section below]*.

## Superseding Case Information

Superseding to Case No: 17-cr-20406 _____    Judge:  John Corbett O'Meara _____

☐ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☒ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
|---|---|---|
| D-2  Alphons Iacobelli | 18 USC 371, 29 USC 186, | N/A |
| D-3  Monica Morgan | and 26 USC 7201, 7206 | N/A |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

July 26, 2017 _____
Date

BRUCE C. JUDGE
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226-3277
Phone: 313-226-9122
Fax:   313-226-3413
E-Mail address: Bruce.Judge@usdoj.gov
Attorney Bar #:  CA 148805

---

¹ Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, or (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.