UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

Case No. 17-cr-20406
Honorable Paul Borman

v.

D-2 ALPHONS IACOBELLI,

Defendant.

_____/

## SENTENCING MEMORANDUM OF ALPHONS IACOBELLI

On August 27, 2018, Defendant Alphons Iacobelli will be sentenced for the offenses to which he pled guilty on January 22, 2018, specifically (1) conspiracy to violate the Labor Management Relations Act and (2) Subscribing a False Tax Return.  These charges carry a statutory maximum sentence of ninety-six (96) months imprisonment.  Mr. Iacobelli accepts full responsibility for his role in these offenses.

Mr. Iacobelli respectfully requests the Court to impose a sentence not to exceed the guideline range of 37 to 46 months.  The requested sentence strikes an appropriate balance between the individualized considerations related to Mr. Iacobelli and his role in the offense and the purposes of punishment articulated in 18 U.S.C. § 3553(a).

1

## I.     BACKGROUND

### A. Personal Background

Mr. Iacobelli is fifty-nine years old.  He has no criminal history.  He was born in Detroit, Michigan, and graduated from Notre Dame High School in Harper Woods in 1977.  Mr. Iacobelli attended Wayne State University and graduated in 1987 with a Bachelor of Arts in Political Science and Economics.  In 1992, Mr. Iacobelli earned a Master of Arts in Industrial Relations.  In 2000, Mr. Iacobelli earned a Master in Business Administration from Michigan State University.  He later participated in post-graduate programs that specialized in executive management.  These programs were through the Harvard Business School, INSEAD Business School in France, and the International Institute of Management in Switzerland.

Mr. Iacobelli began working for Chrysler Automobiles ("FCA") in 1993 and worked there until 2015.  From 1993 until 2002, Mr. Iacobelli was a senior manager and a senior professional and personnel representative in manufacturing and industrial relations.  From 2002 to 2006, he served as the Director for Manufacturing Human Resources.  From 2006 to 2007, Mr. Iacobelli was the Director of Employee Relations Planning and Manufacturing Human Resources.  Then from 2007 to 2015, Mr. Iacobelli was the Vice President of Employee Relations.  In this role his duties included the development and execution of FCA and United Auto Worker ("UAW") negotiations and collective bargaining agreements. Mr. Iacobelli was the lead

negotiator in the 2009 Chrysler/UAW Agreement.   Mr. Iacobelli left FCA in 2015 and took a position at General Motors ("GM") from 2016 to 2017 as the Executive Director in Global Relations and Labor Strategy.

### B. Offense Overview

Mr. Iacobelli pled guilty to two counts of the First Superseding Indictment: Count 1, Conspiracy to Violate the Labor Management Relations Act, and Count 7, Subscribing a False Tax Return.

Relating to the conspiracy count, from 2008 until he left in June 2015, Mr. Iacobelli was the FCA Vice President for Employee Relations.   In this role he was the senior FCA official responsible for negotiating with the UAW and for administering the collective bargaining agreements between FCA and the UAW, including the resolution of disputes and grievances that arose under the collective bargaining agreements.

As stated in the Indictment, between in or before January 2009 and continuing through in or after June 2015, Mr. Iacobelli participated in a conspiracy in which FCA and certain of its executives and employees agreed to pay and deliver, and willfully paid and delivered, money and things of value to officers and employees of the UAW.  As part of that conspiracy, Mr. Iacobelli and other FCA executives and FCA employees acting in the interest of employer FCA used the bank accounts and credit card accounts of the UAW-Chrysler Skill Development & Training

Program d/b/a the UAW-Chrysler National Training Center ("NTC") to benefit officers and employees of the UAW, knowing that those individuals were not permitted to receive the money and other things of value. Over the course of the conspiracy, Mr. Iacobelli and other FCA executives and FCA employees unlawfully paid and delivered more than $1.5 million in prohibited payments and things of value directly and indirectly to UAW Vice President General Holefield, UAW Assistant Director Virdell King, and other UAW officials. Mr. Iacobelli has admitted that this was done in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW.

Relating to Count 7, Subscribing a False Tax Return, Mr. Iacobelli willfully made and subscribed a false Form 1040 tax return for calendar year 2014, verified by a written declaration that it was made under the penalties of perjury, and caused it to be filed with the Internal Revenue Service.

### C. Legal Proceedings

On July 26, 2017, Mr. Iacobelli was named in a 12-count First Superseding Indictment. On August 1, 2017, Mr. Iacobelli was arraigned and entered a plea of not guilty. On January 22, 2018, Mr. Iacobelli tendered a plea of guilty to Counts 1 and 7 of the First Superseding Indictment. The Court accepted Mr. Iacobelli's guilty plea and took the Rule 11 Plea Agreement under advisement.



The corruption that is the focus of this case did not begin with Al Iacobelli. The practices that form the backbone of this case did not begin with Al Iacobelli. The system of corruption that has been exposed here did not begin with Al Iacobelli. Mr. Iacobelli's hope is that such practices – which did not originate with him – nor for that matter the others who have been convicted here – will end with him. Admittedly, he was part of the problem. He was not <u>the</u> problem.



To be clear, none of this is intended in any way to take away from Mr. Iacobelli's own serious misconduct.  This is not "If you think I am bad, you ought to see my brother"… it is "I was wrong and so was he."  Otherwise, the conduct just continues and the practices just continue with different people.  That is exactly what has occurred in the past.  Different people doing similar things.

## III.    DISCUSSION OF SENTENCING FACTORS

Individualized consideration of the facts and circumstances present in this case, as to Mr. Iacobelli, reveals that although authorized as the maximum possible sentence, a ninety-six month prison term is unwarranted and would be unjust.  A ninety-six month sentence is at odds with the directive that courts impose a sentence that is "sufficient, but not greater than necessary," to reflect the seriousness of the offense, promote respect for the law, provide just punishment, to afford adequate

deterrence, and to avoid unwarranted sentencing disparities (among other objectives).  18 U.S.C. § 3553.

### A. Sentencing Considerations

#### 1. 18 U.S.C. § 3553(a)(4) & (a)(3): The Starting Point and the Kinds of Sentences Available

Pursuant to U.S.S.G. § 5G1.2(b), Mr. Iacobelli's sentencing range is 97 to 121 months.  Because there is no statutory mandatory minimum and the guideline range is merely the starting point, *Gall v. United States*, 552 U.S. 38, 49 (2007), the Court may sentence Mr. Iacobelli to a lesser term, and the statutory maximum for these two offenses is 96 months.  Counsel respectfully urges the Court to sentence Mr. Iacobelli as though the functional sentencing range here is 37 to 46 months.

Counsel believes that a custodial sentence within the guideline range of 37 to 46 months appropriately accounts for Mr. Iacobelli's wrongdoing, and comports with the myriad of sentencing considerations ███████████████████████ ███████████████████████ and the sentences imposed (or to be imposed) on others in this case; ██████████████████████████████████████ ██████████

#### 2. 18 U.S.C. § 3553(a)(1): History and Characteristics of the Defendant

In passing sentence, the Court is to consider "the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  This is because "the punishment should

fit the offender and not merely the crime." *Williams v. New York*, 337 US. 241, 247 (1949). Crimes do not get sentenced, people do. Al Iacobelli is "more than" a former FCA executive who conspired with other people and organizations to violate the labor laws and to violate tax laws – though he is that too. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

### 3.   18 U.S.C. § 3553(a)(1): Nature and Characteristics of the Offense and Mr. Iacobelli's Role In It

In multi-defendant cases such as this, courts "must sentence each defendant separately. Though it should of course avoid disparities among defendants of equal culpability, the court must come to an independent determination of the appropriate punishment for each defendant[.]" *United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013), *as corrected* (July 24, 2013) (citing 18 U.S.C. § 3553(c)).

Again, nothing in this section is meant to justify or in any way minimize Mr. Iacobelli's actions. Rather, the information is offered to properly situate Mr. Iacobelli's misconduct within "the nature and circumstances of the offense[.]" 18 U.S.C. § 3553(a)(1). Gauging Mr. Iacobelli's culpability is a necessary predicate to crafting an appropriate sentence, making it imperative to examine Mr. Iacobelli's actions within the context of the entire offense. This includes an individualized assessment of his conduct and criminal history, as well as the circumstances relating to the commission of the offense and the impact of the crime on victims.

### a. The Conspiracy

As set forth in the Indictment and Mr. Iacobelli's plea, the crux of the conspiracy was that FCA and certain of its executives and employees agreed to pay and deliver things of value to officers and employees of the UAW, knowing that those individuals were not permitted to receive the money and things of value.

One of the ways that FCA and its executives and employees did this was through the use of the NTC. The NTC was a tax-exempt corporation based in Detroit, Michigan and as described by the government, "purported" to function as a labor management committee under the Labor Management Labor Relations Act, 29 U.S.C. §186 (c)(9), and its "stated" purpose was to provide for the education, training, and retraining of workers. The NTC received its funding from FCA, had its own governing board called the Joint Activities Board, and its own bank accounts.

The Vice President of Employee Relations of FCA and the Vice President of the Chrysler Department of the UAW served as the Co-Chairmen of the NTC Joint Activities Board.  Other senior officials from FCA and the UAW made up the remainder of the Joint Activities Board.

### b.  Mr. Iacobelli's Role in the Conspiracy

During the relevant time period, Mr. Iacobelli served as the Co-Chairman of the NTC and the NTC Joint Activities Board.  In this role, Mr. Iacobelli and others controlled the spending of the NTC.  He and his co-conspirators provided more than $1.5M in payments, which included monetary funds and things of value, directly and indirectly, to UAW officers and employees.  The payments included travel, designer clothing, furniture, jewelry, and paying off a mortgage.

### c.  Discussion

This is a serious case, it involves serious offenses.  It is a case that will involve a custodial sentence being imposed upon a man who accepts responsibility for these offenses and who acknowledges that this conduct is deserving of a custodial sentence.

Mr. Iacobelli has become the focus of this wide ranging case.  He has been thoroughly vilified in the media, and in communications to interested persons, for years.  Pictures of his home have been prominently displayed, with the address, resulting in numerous instances of people driving by and making displays and

gestures.  To the extent his actions have brought this on, that, too, is self-imposed.
But, it is punishment – and severe punishment, not only for what he did, but for what
others did, who apparently believe it is a good idea to lay the blame for all this
misconduct at the feet of Al Iacobelli.  Much of it belongs there; much of it does not.

The starting time period under this Indictment is January 2009.  However the
reality is that the conspiracy at issue here had started long before that.  Mr. Iacobelli
joined an already ongoing conspiracy.  The practices and corruption that are the
focus of this case started long before Mr. Iacobelli.

So, what happened here?  How and why did this widespread scheme occur?
And why for so long, and so many people?

The National Training Center in its recently filed lawsuit against Mr. Iacobelli
and others, uses that Complaint to put forth a statement of all of its laudable
purposes.  They do not need repeating – nor disputing, except to say that it is not the
Government's view of things.  In fact, the Presentence Investigation Report provides
that "according to the Government, the NTC is an unindicted co-conspirator in this
case . . ." Additionally, it is noteworthy that in the Plea Agreement, the parties agreed
that "the NTC purported to function as a labor management committee under the
Labor Management Relations Act, 29 U.S.C. 186(c)(9).  The stated purpose of the
NTC was to provide for the education, training, and retraining of workers."

There is another side of this – as often is the case – that despite the "purported" laudable goals and purposes of an organization, some of the practices are far removed from those purposes.

To be very clear, the money in the NTC accounts is NOT union members' money.  The money taken and misused for personal purposes by representatives on both sides (UAW and FCA) was not money taken from union members.  The funding of the NTC was by FCA (also alleged to be a co-conspirator, along with the UAW).  The funds originated at FCA and were paid to the NTC per a labor contract.  The NTC fund is very large – and the oversight was not very effective.  NTC officers and members of the Joint Activities Board (some of them) routinely had their own private charities etc.  They had NTC issued credit cards.  They had access to large sums of money – and they (again, some, not all) misused funds for personal purposes.  Some representatives of the Union and the Company did this for many years.

Mr. Iacobelli succumbed to the temptation at the NTC – it is as simple (or not) as that.  He does not claim that he took the money out of some financial need.  The things he purchased with NTC funds were not necessities.  Indeed, so far as counsel is aware, the things purchased by others involved in this case were of similar character – hardly necessities for people who were being well compensated.  The fact that a number of people, on both sides of the NTC structure, were misusing

funds for similar kinds of things, speaks to the mindset and culture that existed there. None of the people charged here designed this way of doing business. They each stepped into a culture where such things had been going on for a long time, in various ways, and they participated in the same practices. Whether they felt "entitled" or just "enabled" matters very little.

There may be a difference of opinion as to whether this conduct infected, or influenced, the labor bargaining process or the agreement(s) ultimately reached between FCA and the UAW. According to media reports, similar investigations are going on regarding other OEM's training center entities and the unions. Both FCA and UAW officials contend that "it had no effect." Mr. Iacobelli, however, has stated that the payments were made in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW. That is exactly why they were made. Because the funds were being accessed and used for that purpose, some of the participants, such as Mr. Iacobelli, also used these funds and things of value for their own personal benefit.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

**████████████████████████████████**

**████████████████████████████████**

**4. 18 U.S.C. § 3553(a)(2)(A): The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, To Promote Respect for the Law, & to Provide Just Punishment for the Offense**

As was acknowledged at the outset, these are serious offenses. Punishment will be (and has been) meted out. But, this provision of § 3553 speaks of "just" punishment. The statutory maximum here is 8 years, if the maximum for each count is added together and imposed. That is not "sufficient but not greater than necessary"; it is considerably "greater than necessary." Obviously, 8 years is more of a punishment than 4 years. "More" yes. "More just" no.

This Court (all courts) hear often that "Mr. X has already been punished enough," Mr. Iacobelli is not arguing that he already has been punished enough – though he already has been punished a lot. He has lost two jobs; his reputation is ruined; his financial situation has been decimated; he faces lengthy imprisonment,

**████████████████████████████████**

**████████████████████████████████**

**████████████████████████████████**

**████████████████████████████████**

**████████████████████████████████**

**████████**

This is significant punishment for not only Mr. Iacobelli's family, but even more so for Mr. Iacobelli who is carrying a huge amount of guilt for his misconduct. He now has to deal with this punishment for what he has caused his family as well. That is not an insignificant "punishment," even if self-created.



### 5. 18 U.S.C. § 3553(a)(2)(B): The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Conduct

To the extent that general deterrence is a recognized purpose of sentencing, it necessarily involves a "sufficient but not greater than necessary" analysis. That is particularly the case when trying to predict what punishment of one person is appropriate to deter a different person from committing a similar offense in the future. And, of course, that entire concept has serious flaws when one looks at the

conduct of those who are well aware of the serious consequences that are visited upon those who have done similar things, but who are not deterred by such knowledge. Is the fact that prior offender "A" was sentenced to a "mere" four years for an offense rather than eight, the reason that offender "B" was not deterred? Neither common sense nor experience suggest that can be correct. The incremental deterrent effect from four to eight years, for example, is critical if this concept is to be utilized in fashioning a sentence.

To bring this point to bear upon this case, Mr. Iacobelli faces up to 8 years for his involvement in this conspiracy. Will that serve to deter others similarly situated from committing such an offense? Would a sentence of twenty-four months, or would we need a sentence of sixty months, or . . . ? Mr. Iacobelli's plight has been widely publicized; his life has been turned inside out; he faces years in prison and nearly a million dollars in restitution; he has paid huge legal fees; he has been named in civil suits; the personal toll on him and his family is devastating; when he gets out of prison, a significant part of his professional life also will be behind him and his employability will be severely hampered if not ruined. All those things happen whether he is sentenced to thirty-six months or sixty or ninety-six–or for that matter, two. Is it at all realistic to think that a person in a similar position to Mr. Iacobelli, contemplating criminal conduct such as Mr. Iacobelli has admitted, would commit such a crime if he knew of all these consequences and that he also knew Mr. Iacobelli

was sentenced to eight years, or six, or five–but he would not commit the offense if he knew of all the other consequences but knew he would "only" be sentenced to thirty months in a federal prison rather than sixty, or ninety-six?  That is hard to even imagine. The incremental deterrent effect is non-existent once we begin with what Mr. Iacobelli already has gone through and then couple that with some significant custodial sentence.

There is not a request in this case for time served, or a year and a day, or any sentence that could be deemed "lenient."  Mr. Iacobelli has not sought such a sentence, and such a request would not have been realistic in counsels' view.  That decision was made with "general deterrence" in mind.

A sentence not to exceed the guideline range of 37 to 46 months is "sufficient, but not greater than necessary", to afford adequate deterrence here.  Acknowledging that there is no "scientific guide" to the question of deterrence, much has already been achieved in promoting general deterrence in this case.

By indicting Mr. Iacobelli and others in this case, the federal government made its intent to vigorously prosecute corporate criminals crystal clear.  To the extent corporate officials are more likely to be deterred by the possibility that their actions could result in individual criminal liability and imprisonment than by concerns about organizational culpability, Mr. Iacobelli and the other company officials' highly-publicized prosecutions have already served as warnings to would-

be corporate criminals. *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (quotation omitted). The deterrent message was sent and received well before formal imposition of this Court's sentence, and that message will be amplified by a sentence within the guideline range of 37 to 46 months of Mr. Iacobelli. *Cf. United States v. Musgrave*, 647 F. App'x 529, 533 (6th Cir. 2016) (*Musgrave II*) (rejecting prosecution's argument that a *non-custodial* sentence failed to afford adequate deterrence).

### 6. 18 U.S.C. § 3553(a)(2)(C): The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant

Regarding specific deterrence, there is no risk that Mr. Iacobelli will commit crimes in the future. Other than the offenses to which he has pled guilty here, Mr. Iacobelli has an unblemished criminal record. He has accepted responsibility for his actions and expressed his sincere remorse for the poor choices that have brought him before the Court.

Mr. Iacobelli has had no prior contact with the criminal justice system, and is therefore, among the class of defendants least likely to reoffend. *See* U.S. Sent'g Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* (March 2017) (multi-year empirical study concluding that defendants with

zero criminal history points *and* no prior contacts with criminal justice system are statistically less likely to recidivate than defendants with zero criminal history points but some prior contact with criminal justice system).

### 7. 18 U.S.C. § 3553(a)(6): The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

Seven people have been charged in this case:  Jerome Durden, Mr. Iacobelli, Monica Morgan, Virdell King, Keith Mickens, Nancy Johnson, and Michael Brown. All have pled guilty.

According to the terms of their plea agreements, their maximum custodial sentences are:

- Jerome Durden, 37 months

- Monica Morgan, 27 months

- Virdell King, 16 months

- Keith Mickens, 27 months

- Nancy Johnson, 18 months

- Michael Brown, 18 months.

Mr. Iacobelli's plea agreement provides that his sentence cannot exceed 96 months.  Mr. Iacobelli's possible exposure is almost 3 times more than any other

defendant in this case.  To date, only Ms. Morgan has been sentenced, and she received a sentence of 18 months.

One similar case from the Eastern District of New York in 2009 is worth at least mentioning, as the facts are somewhat analogous to these.  *United States v. Catapano*, 1:05-cr-00229-FB (E.D.N.Y. 2009), *United States v. Mikuszewski*, 1:05-cr-00229-FB (E.D.N.Y. 2009).  Andrew Catapano was the President of AFC Enterprises, Incorporated.   John Mikuszewski was a consultant to Rosewood Contracting Corporation.  Both Mr. Catapano and Mr. Mikuszewski pled guilty to charges of conspiracy to make unlawful labor payments and mail fraud.  Both admitted to conspiring to bribe union officials and utility company representatives on numerous roadway reconstruction projects awarded by DOT grantees throughout the New York area from 1998 to 2001.  According to the Indictment, "between January 1990 and December 2001, Catapano and Mikuszewski paid approximately $1 Million in bribes to business agents of Locals 14 and 15.  In exchange for these payments, the business agents agreed not to enforce a number of the provisions of the collective bargaining agreements with AFC, Rosewood, and the Related Companies."

Mr. Catapano was sentenced to ten months in prison along with 2 years of supervised release and 200 hours of community service.  Mr. Mikuszewski was

sentenced to five months in prison to be followed by 5 months of home confinement and two years of supervised release.

Mr. Iacobelli is not seeking such a sentence, or anything remotely resembling such a sentence, but he should not be sentenced to more than the 37-46 month range urged herein.

### 8.  18 U.S.C. § 3553(a)(7): The Need to Provide Restitution to any Victims of the Offense

The parties have agreed to restitution in the amount of $835,523.00.  This restitution will be paid to the Internal Revenue Service which is the only victim identified in this case.  On February 18, 2016, Mr. Iacobelli, through his counsel, arranged for funds in the amount of $354,000 to be "seized" pursuant to a federal seizure warrant.  The parties agreed to seek authorization to apply the $354,000 to the restitution amount, which would bring Mr. Iacobelli's tax obligation to approximately $490,000.

It is important to point out that it is the government's view that the NTC is not a victim for the purposes of restitution.  The Presentence Investigation Report provides that "according to the Government, the NTC is an unindicted co-conspirator in this case, and should not receive restitution on behalf of USA members."

## Custodial Sentence Conclusion

As set forth above, virtually every statutory factor supports a reduced sentence and, considered together, they establish that a sentence within the guideline range of 37 to 46 months is appropriate here.

### a.  Fine

The parties did not agree to a fine as part of their plea agreement.   The maximum fine for Count 1 is $250,000.  The maximum fine for Count 7 is $100,000. Mr. Iacobelli, through counsel, respectfully submits a fine should not be ordered in this case.  Mr. Iacobelli will be paying very significant restitution.  In addition, Mr. Iacobelli's future earning power after his release from custody will be substantially reduced as a result of his convictions.

## IV.    CONCLUSION

The maximum sentence punishable here is 8 years.  The guidelines range as calculated by the Probation Department is  97 to 121 months.  Due to the statutory maximum of 96 months, the guideline range does not apply.  ██████████████

███████████████████████████████████████████████

████████████████████████████

Mr. Iacobelli knows that a custodial sentence awaits him.  He accepts that. However, he has had no income for the past year and his financial situation, and that of his wife, is a cause of great concern.  In addition to the very significant restitution

to the government of taxes, Mr. Iacobelli has had very substantial legal fees already, and now has been sued along with his wife, by the NTC for several million dollars, and the Iacobellis have had to retain counsel to defend that matter.

Mr. Iacobelli knows the need to finish his custodial sentence before he can obtain employment and realize some income, and hopefully, health insurance. ████

████████████████████████████████████████████

████████████████████████████████ We respectfully request this Court to take that into consideration.

Under 18 U.S.C. § 3553, taking all of the factors into consideration, and the particular facts of this case with Mr. Iacobelli's circumstances, it is respectfully urged that the Court impose a custodial sentence not to exceed the guideline range of 37 to 46 months.

Respectfully submitted,

Butzel Long

Dated: August 13, 2018

*/S/ David F. DuMouchel*
DAVID F. DuMOUCHEL (P25658)
DAMIEN P. DuMOUCHEL (P74188)
41000 Woodward Avenue
Bloomfield Hills, MI 48304
(248) 258-1616
dumouchd@butzel.com
dumoucheld@butzel.com
*Attorneys for Alphons Iacobelli*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.   There are no unrepresented parties upon whom traditional service is required.

Respectfully submitted,

Dated: August 13, 2018                    */S/ David F. DuMouchel*
                                          DAVID F. DuMOUCHEL (P25658)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

                              Case No. 17-cr-20406
                              Honorable Paul Borman

v.

D-2 ALPHONS IACOBELLI,

                    Defendant.

_____/

## SENTENCING MEMORANDUM OF ALPHONS IACOBELLI

EXHIBIT A

FILED UNDER SEAL